The last case this morning is KG Dongbu Steel vs. Nucor and the United States, 2025-1411. When you're ready, Mr. Tesluk. Good morning. May it please the Court, Adam Tesluk for Appellate Nucor Corporation. There are two issues before the Court in this appeal. The first is whether the Commerce Department's determination that the benefits conferred by the – whether the Department of Commerce properly reconsidered the issue of the benefits conferred by the first three debt-to-equity restructurings in Dongbu Steel's debt restructuring program. It was. Commerce complied with both governing case law and agency practice by citing to new record information and articulating reasonable legal justifications for changing its determination. The second issue is whether Commerce properly found that any benefits conferred by the first three debt-to-equity conversions passed through to KG Dongbu Steel following the KG Consortium's investment. Especially in light of KG Dongbu's concession of the pass-through issue in the initial questionnaire response and its failure to respond to Commerce's change in ownership appendix, Commerce's determination was lawful and supported by substantial evidence. So beginning with Commerce's reconsideration of the first three debt-to-equity conversions, Commerce like other agencies may reconsider its prior determinations. What is done in the past doesn't bind it to the same outcome in perpetuity. As a general proposition, this is not in dispute. Let me get right to what I think is my question and I'm not sure exactly where the line is on this, but I just want to make sure I understand the facts. Commerce didn't come up with any new information directly about those first three transactions, right? No, it was not directly related, but... They looked at a fourth transaction and it said, well, the facts, this fourth transaction, in comparison with those three, lead us to think maybe we were, you know, in retrospect, didn't come to the right conclusion. They didn't have necessarily a mistake, but they said, well, this fact that at least is indirect evidence of our mistaken view, or I don't want to say mistake, because that gets into a problem, I think, with the trial court's reasoning. Is that basically what Commerce did? That's effectively what Commerce did. So Commerce, as the... And how is that not... I'm sorry, I'm interrupting you, but I'm just trying to get to it. How is that not, in violation of Commerce policy, not to reconsider the transactions on their own? Well, the Commerce policy at issue here is its general practice of not reconsidering prior countervailability determinations without new evidence. Here, our position is Commerce cited to new evidence and... Again, I'm going to interrupt you. Is this whole dispute boiling down to that the trial court seemed to require direct evidence, new evidence from those specific transactions versus the indirect evidence from the fourth transaction considered in light of those first three transactions? Essentially, that's correct, Your Honor. If we think that indirect evidence is good enough, then what Commerce did in its reasoning is sufficient. That's correct. Okay. Well, let me then move on to the second point. And then I'll let you go back to do whatever you want. On the second point, Commerce explained itself. I think that the trial court, in the first remand determination, found the pass-through analysis insufficient, but then ended up in its final... The court's final decision, that's the one up here on review, didn't reach it because Commerce initially, or finally, caved to what the trial court kept telling it to do, as they ultimately end up doing a lot of times. If we agree with you on the first point, that the trial court was too restrictive in what constituted new evidence and a new rationale for reconsideration, do we need to remand the pass-through issue to the trial court to reconsider? Because it doesn't seem like she has a final decision on that with correction of the first there. Or is that just something, because we have the same review that the trial court does, that we could just determine on our own that there's substantial evidence on the second point? This court could absolutely determine that issue on its own, Your Honor. So the Commerce Department addressed this in two separate occasions. First, in its final determination, and then in its first remand redetermination. So there are two instances of Commerce exercising its authority to address this in the first instance, and there are two instances of the court remanding. So our position is that the first two redeterminations determine it. And I understand there's a procedural thing that they didn't respond at some point. So that's one way for Commerce to say that they didn't prove that there's no pass-through. But did Commerce come up with an alternative basis on the facts, too, that we could review? Yes. Commerce cited two pieces of information. So it's cited to the notice of final modification, which governs the pass-through question. And that provides that a primary consideration of Commerce in determining whether a subsidy passes through is whether the sellers of the company have operated in a manner to maximize the value of what is sold. Commerce pointed to a significant discretion between the prices paid by the creditor committee shareholders and the actual private investor in the KG Consortium. It determined on that basis that the sellers of this company or these assets weren't actually operating to maximize their returns if you're paying five times more for the same asset than the non-government entity is investing. So that's primarily how Commerce rested its decision. But primarily, the determination was based on the fact that KG Dongbu did not follow procedural requirements, did not respond to the change in ownership appendix. And in the first remand redetermination, there is actually a detailed discussion of the types of information requested in the change in ownership appendix and why it mattered for the purposes of the record that it was not there. And as this Court has held, Commerce has broad discretion to develop and enforce procedural requirements related to the development of the record. And so on that basis alone, it's sufficient. But yes, Commerce did cite factual information to suggest that KG Dongbu had not rebutted the rebuttable presumption. So under governing case law, Commerce may reconsider prior determinations based on new information regarding the operation of a subsidy program, but it may also reconsider to correct what it believes are errors in its prior determination or simply because a changed methodology would lead to more accurate results. The only requirements are that Commerce acknowledge the change in position and that it provide a reasonable explanation that is supported by substantial evidence. With respect to the debt-to-equity conversions that issue here, Commerce satisfied both of these requirements. First, Commerce acknowledged that it was changing position. Second, it provided adequate explanation for its reconsideration. This explanation both cited to new evidence and articulated sufficient legal justifications for the outcome. There was new evidence on this record, which was not identical to the record of the prior reviews. A fourth debt-to-equity conversion occurred during this period, and this debt-to-equity conversion coincided with an investment by a private investor that was not a member of the creditor committees. This factual change is also not in dispute. The only question is whether Commerce, as the finder of fact, reasonably determined that the circumstances surrounding the fourth debt-to-equity conversion were sufficiently related to the program as a whole to warrant reconsideration. This is a question of fact that should be reviewed for substantial evidence, which means could a reasonable mind conclude that the circumstances of the fourth debt-to-equity conversion shed light on the conversions that preceded it? If there isn't some relationship between the fourth determination and the earlier determinations, could Commerce nonetheless decide, well, we don't like the earlier determinations, we don't think those were the best decisions, we're going to change our mind? Absolutely, Your Honor. So Commerce could have just said, again, conceding for the sake of argument that that's the case, Commerce, there was no new evidence on the record sufficient to justify reconsideration. Commerce could have simply looked back and said, we got this wrong, and that's what it did here. I mean, even if Commerce's position is that we don't look back without new evidence, they can ignore that and just say, well, in this case, there's no new evidence, but we don't think we did the right thing, we're going to change our mind. Well, they didn't ignore their past practice, Your Honor. So they did cite new evidence on the record that Commerce believed was sufficiently related to the first three swaps to warrant reconsideration. I understand. This is more hypothetical. The question is, how do we balance Commerce's regular position of not reviewing prior reviews without new evidence and the notion that Commerce can change its mind if it wants to? The stated agency practice is just that, Your Honor. It's an agency practice, and just like any other agency practice, Commerce can deviate from it as long as it provides good explanations. And both this Court and the CIT have held that correcting legal errors and making determinations consistent with longstanding practice and regulation is a sufficient justification. Or even just a change in policy, I assume.  I mean, they could say, look, we have this practice. We usually don't change positions without new evidence. But here, we've reconsidered our policy, we are changing our policy, and here's the rationale for doing that. As long as that holds up, even if it's in conflict with their practice of not changing without new evidence, as long as it's still based upon substantial evidence and not arbitrary and capricious, they can do that, right? That's correct, Your Honor. And we set a couple of examples of this in our brief. We never read that general policy to be Commerce foreclosing its ability to reconsider a determination simply based on argument. Let me be clear, because I think I understand this. But Commerce's views now that those first three actually should have been kind of available doesn't actually do anything to the actual review periods for those first three. They're done, and the rates determined in them are done, and Commerce is not going back and changing the rates because they found that it should have been kind of available. It's only going forward from the fourth review. That's correct, Your Honor. So everything that happened in the first three reviews, it's water under the bridge, entries have been liquidated, duties have been assessed, and those duties are not being modified, nor are any adjustments being made to the duty rate in this POR based on what happened in those reviews. This is simply based on the amount that's attributable to this POR going forward based on Commerce's allocation methodology for nonrecurring subsidies. So if there's no more questions, I'd like to save the rest of my time for rebuttal. We will save it for you. Mr. Jordan. Mr. Mills. Yes, sorry, Mr. Mills. Oh, here. No problem. Good morning, and may it please the Court. I'm Brady Mills from Taft on behalf of Plaintiff at Police, Dongbu Steel. Contrary to appellant's arguments, this case involves a straightforward violation of the SKF principle that is aggravated by the fact that Commerce disregarded its own practice as memorialized in the instructions in its questionnaire that it will not reconsider previous determinations regarding the countervailability of a program absent new evidence. And why isn't the evidence that arose from the fourth transaction indirect evidence about what happened in the first three? Well, Your Honor, the way these debt equity swaps work and the way Commerce calculates the benefits, they're all very separate and distinct events. So the first one was in 2015, the second was in 2016, and the third one was in 2018. Commerce gave an explanation. They said these first three all involved. At the time, they said there's enough evidence that independent or private investors were getting the same whatever benefits as the government so that they didn't see that as countervailable. Then they get to the fourth one, and you get a more independent private investor, and they say, oh, well, this private investor did not look at this transaction in any way similar and required a lot more stuff, and that leads us to think that we were wrong about the first three and that there should have been a countervailable. Why isn't that indirect evidence about those first three? So, Your Honor, what I would like to discuss is that part of the history of this case is that in the first... Can you just answer my question about why you can't consider evidence from the fourth? Because this is where I think the problem for me with the trade court's decision is that she seemed to suggest that you can't consider indirect evidence and it had to be direct evidence related to those three transactions, not evidence from the fourth transaction that called into question the three. Do you agree that evidence from the fourth transaction could be sufficient for commerce to call into question its views on the first three? No, I don't. We, as a matter of law, think you're wrong on that, and there's a problem. But what's your argument for why they can't? Because, again, as I started to discuss, just the way these debt equity swaps work, I mean, there was decisions made in 15, 16, and 18 where there was evidence that related to those decisions, and then commerce made a determination. So what happens in 2019, four years later from the first debt equity swap, that is not relevant to whether in 2015 commerce's determination was... I'm sorry? Commerce's view it was. And they explained why it was. And we have to judge that based upon whether there's substantial evidence for that and whether it's arbitrary or capricious. Okay, so part of our argument is based on the fact that they had a practice in their questionnaire that they needed new evidence. Right, they've got to give an explanation. You have to stop talking over it. I understand I'm interrupting you, but I get to do that because I want to get to the questions. They get to do that, right? If they say, our policy is this, sure, it's their policy. Commerce can always come in and say, yes, our policy is this, but in this case, we're not going to follow it because of these reasons. And they're allowed to do that. So just getting back and saying, their policy is this, their policy is... doesn't help you for me in this case. So the question is, why was it not relevant that the factual circumstances of this fourth one illuminated what may have been going on in this third one in a different light and caused them to reconsider it? Your Honor, so again, my position is that just because the later in time aspect of it and the fact that the way commerce evaluates these debt equity swaps, what happened in 2019 is not relevant to those already decided decisions. But moving past the evidence point, commerce still has to show that their change in agency practice was reasonable, that they gave good reasons for why they changed their practice. And so getting into that issue, right, under SKF and the cases, commerce, putting aside the evidence issue, they have to give good reasons why they're changing their mind. And so in this case, in the final results, commerce pointed first to the existence of these fourth debt equity swaps. And the lower court correctly found that your policy is that you need to have new evidence, and here the court found that that evidence related to something that occurred in 2019 does not change, is not relevant to your determination to that... If that's legally wrong, then move past that and explain to me why commerce's rationale is not reasonable. Yeah, okay, so commerce, in the first administrative review, there was an appeal of the first two debt equity swaps. And in that litigation, the government defended its determinations that there was significant private investor participation in the first two debt equity swaps. They specifically defended the fact that the practice that they had applied, that their determination regarding significant private investor participation was consistent with its practice, okay? And so now commerce has basically stood behind its decision and its determination and how it evaluated whether private investor participation... There's no dispute for the first three transactions, commerce said, not countervailable, sufficient private investor thing to check whatever. None of that history is disputed. They don't dispute it. All that's at issue is, is the rationale given in the fourth one for saying, look, we have new evidence on the record in the fourth one that suggests we came to the wrong conclusion in the first three. And therefore, we're going to now find that those should have been countervailable and look at this in a new light. Why is that an arbitrary or unreasonable determination? Because, you know, it's true that commerce can't go back as to the first three debt equity swaps and sort of re-liquidate the entries or whatever. But the fact of the matter is commerce, you know, viewed the evidence in each of those cases and made a determination. So there's three final determinations basically looking at this issue saying that this program, that there's no benefit from these debt equity swaps. And now in the fourth review, there's a certain... Even though there's no retroactive effect in terms of liquidating the entries or whatever, it's basically saying, oh, everything we said before and what we defended in court in the first review is, you know, we're going to disregard that and we're going to just change our mind. And so I'm... But they have expressed a good reason why they want to do that. Well, we dispute that the existence of a fourth debt equity swap, right, in 2019 is a good reason for reconsidering. It's like...  Why? Why? You're talking over me again. Tell me why. Not tell me they've done it this way a long time. Because what I hear from you and what I hear from the trial court's opinion is when Commerce starts doing this, they really can't change their mind, even if they have a decent reason. Why isn't the reason they gave in the fourth determination a sufficient reason for reassessing whether it was counter-available in the first? Because in the fourth debt equity swap, the fact that there was a private investor that participated in that doesn't change the fact that there were private investors in the first three debt equity swaps. The independent investor in the fourth one was of different quality or character or gave us more information and was clearly more independent and treated these transactions in a different way. You may disagree with that, but that's what they said, right? Yes. Essentially. I don't need to get into the nitty-gritty details of what they said. They understood the facts there to be a different kind of independent investor and that, in comparison to the private investors in the third, suggested they weren't so independent. Is that not... Assuming the facts are true, you can dispute the facts, but that's substantial evidence. If that's true as a matter of fact, why isn't that a reasonable explanation for a change in policy? Okay, so first of all, I would say that the facts that related to the fourth debt equity swap and the fact that there was an outside private investor... Don't talk to me about the facts. I told you, accept the facts are true. Well, there's a factual distinction. I understand. That's a different question. I'm not asking you about the facts right now. You can argue that they're not substantial evidence. I want to know why you think commerce's explanation, if supported by substantial evidence, is unreasonable. Again, I think it's unreasonable because what occurred in 2019 with the separate outside private investor does not inform what the private investors did in the first three debt equity swaps. And again, commerce defended... And I know you obviously don't think this is that important, but the fact that commerce defended in the first two debt equity swaps... Well, I think it's entirely important. Commerce couldn't have come in and ignored those first three ones entirely and just said, we're changing our mind. They have to acknowledge that they're changing their mind and give a good reason for it. But they did both of those things. So you have to attack whether it's a good reason or not, not just that they're changing their mind. Okay, I mean, again, I still believe that it's almost an issue of judicial estoppel. If the government argues... Well, that's not the law. If you think that administrative agencies are stopped from changing their position with a rational explanation, then you're just wrong as a matter of law. I mean, that's clear even under SKF. It's certainly clear under Fox, which is a Supreme Court case. The point I'm trying to make is the fourth debt equity swap, commerce said that that was a relevant change because it was an actual outside private investor. That was sort of their rationale. Oh, we've got an outside private investor. You think that's not a good reason? No, I don't think it's a good reason.  Again, I'm sorry I'm not getting my point across, but in the first two debt equity swaps, commerce defended its practice that it could look at the private investors that were existing creditors at the time, right? So it considered the issue about whether... The fourth guy wasn't an existing creditor, right? I'm sorry? In the fourth one, it wasn't an existing creditor. Exactly. That's... That's exactly the point. Commerce said because this is a different type of investor, his willingness to take this on with much more support suggests that these people earlier weren't acting independently. I don't understand what's wrong with that rationale. Okay, I mean, again, in the context of the history of this case, and another point I'm sorry, Your Honor, to make is that commerce had also looked at this issue in the context of loans. So there was loans in the debt equity... There was loans in the workout process and there was debt equity swaps. And so in the case of loans, commerce considered all this evidence about government control over the creditors, and they found that in the loan context, they couldn't use the loans from the private creditors because of the government influence, right? And so commerce was aware of the influence of the government on the creditors committee. And the reason why commerce is now saying that actual outside private investors is significant is because somehow they... It's as though they weren't aware that at the time of the first two debt equity swaps, the creditors that it found could participate in the debt equity swap and could be used as a benchmark were also subject to that same government influence that was in the loan context. And so again, it goes to the point of this being like an arbitrary change, that commerce was fully aware of these facts, right? They actually litigated this issue, and then all of a sudden, they just decide in the fourth review, oh, well, there's an actual outside private investor in this fourth review, so we're just going to reverse what we had previously determined. And I'm just saying that we think that that's an arbitrary change in practice under this court's SKF decision. Well, you know, even if you have a reasonable argument, the problem that I see for you is that the standard of review is substantial evidence. And obviously, commerce took a different view of the impact of the fourth determination, and they thought that that determination opened their eyes as to the propriety of their first determinations, and they took another look at it. And the question is not whether you have a reasonable argument that cuts the other way. The question is whether commerce had a reasonable basis to take the position it took in reassessing its earlier determination. And if their argument is that they had a good basis and there's substantial evidence to support that, then hard for us to overturn it no matter how effective your argument might be. So if it pleases the court, I only have two minutes left. I just want to just briefly touch on the pass-through issue just because if the court was to sustain commerce's change in agency practice, the question arises whether the KG Consortium's purchase of Donggu Steel through the corporate workout process extinguished those subsidies such that they don't pass through the KG Donggu. Do we have to return that to the CIT for a determination in the first instance? Or can we decide that while the case is here? I mean, our position is that because commerce in the second remand and the lower court agreed that the issue of pass-through was moot because of commerce's determination that there was no benefit from the first rudetic results, we believe that the actual merits of the record evidence determining whether there was a pass-through or not was not addressed below. And so it would be more appropriate for the trial court to reconsider that. But if the court did, I mean, I recognize the court has de novo review. So if the court did look at this, the points I wanted to make is that commerce found that the subsidies passed through because Donggu Steel did not submit a response to this change in ownership appendix. And so I just want to make clear that at the time Donggu Steel submitted its response to the questionnaire, commerce had never found the existence of any non-recurring subsidies and had consistently for three reviews found that there was no benefit from these debt equity swaps. So at the time Donggu submitted its questionnaire, it had no basis, no reason to be challenging a baseline presumption about non-recurring subsidies that did not exist. However, if Donggu Steel, even though it didn't submit a change in ownership appendix, it did submit voluminous information regarding the circumstances of the sale of Donggu Steel to the KG Consortium that went to the issue that showed that it was an arm's-length transaction for fair market value. It was an open bidding process and the KG Consortium purchased Donggu Steel as the highest bidder in an open bidding process. And so the record evidence shows that there was an arm's-length transaction for fair market value before the subsidies were extinguished through the purchase. Thank you, Mr. Mills. Mr. Tesluk has some rebuttal time. Thank you. I will be brief and just make a few quick points on rebuttal. First... Can I just ask you to address what he just said? Because that gives me a little bit of pause. They didn't submit the appendix because they didn't expect it to be an issue. Absolutely, Your Honor. Can you just respond to that? Yes. So, as Commerce emphasized here, the proper treatment of this program has been a contentious issue since the very first administrative review. We have argued it aggressively in review after review after review. And in this case, there was a new fourth-to-debt-to-equity swap involving an actual private investor that was a nonrecurring subsidy and that Commerce had not addressed. So there was a nonrecurring subsidy to be addressed in this program. On that basis alone, we think it was unreasonable of KG Donggu to just presume that Commerce would not find any nonrecurring subsidies here. It's also the case that we can... New factual information may be provided throughout the course of a proceeding. We can allege new subsidies. And at the outset of the proceeding, when KG Donggu conceded the issue, it had no reason to believe that we would not do that. And finally, I would just note that this was very early in the proceeding that KG Donggu conceded this issue. So let me make sure I understand what you're saying. The fact that it hadn't been found counter-available in the first three transactions, they shouldn't have assumed it would be not counter-available in the fourth. And if they thought the change in ownership mattered, they should have put that on the record. Absolutely, Your Honor, and that's true both with respect to the first three conversions and the fourth. So even under Commerce's stated practice, they won't look back without evidence. We had an entire administrative review to supplement the record with new evidence, and in fact, we did. And with respect to the fourth, it just hadn't been addressed yet. So KG Donggu had no reason to believe that Commerce would just continue its past practice with respect to the fourth conversion, especially when there was an outside private investor, which is a meaningful factual distinction between the first three and the fourth. So just very, very quickly on this question of the program-wide basis of Commerce's consideration, in the DRAM's case, Commerce explicitly rejected the notion that these debt-to-equity conversion, or these restructuring programs, should be considered on a transaction-by-transaction basis, and that was sustained by the CIT in the Hynix Semiconductor case at 391 FSUP 2D 1337. And that matters here because this review was the first time that Commerce had an opportunity to actually look back at the program from start to finish and see how it started, how it proceeded, and how it ended. Second, I would just like to quickly address the rationale for Commerce's change in practice other than the new factual information. Commerce provided a detailed explanation of why it thought what it did in the first administrative review was inconsistent with both its rule and longstanding agency practice thereunder. It stated its longstanding practice of approximately 40 years of relying on an outside private investor and not treating an inside investor who's just pouring money into this company in hopes of recovering what they've already lent to be an actual private investor seeking to maximize returns. It also cited the bottom-out refrigerator-freezers from Korea case where it considered the nature of the government influence over the creditor committees. And in the first administrative review here, it did neither of those things. It leapt directly to a rote numerical analysis of the volume of shares purchased. And I think with that, unless there are further questions, I will yield. Thank you to both counsel. Case is submitted.